**S & S MACHINERY CO.,**
Plaintiff-Appellant,

v.

**MASINEXPORTIMPORT,** a Romanian Corporation, and the Romanian Bank for Foreign Trade, Defendants-Appellees.

No. 1012, Docket 82–7970.

United States Court of Appeals,
Second Circuit.

Argued March 4, 1983.

Decided April 26, 1983.

Alfred R. Fabricant, New York City (Martin H. Samson, and Shea & Gould, New York City, on the brief), for plaintiff-appellant.

Walter J. Higgins, New York City (Andrew J. Maloney, and Maloney, Viviani, Higgins & Kelly, New York City, on the brief), for defendants-appellees.

Before FEINBERG, Chief Judge, TIMBERS and CARDAMONE, Circuit Judges.

TIMBERS, Circuit Judge:

S & S Machinery Co. ("S & S") appeals from an order entered December 7, 1982 in the Southern District of New York, Whitman Knapp, *District Judge*, granting the motion of defendants Masinexportimport ("Masin") and the Romanian Bank for Foreign Trade ("Romanian Bank") to vacate a prejudgment attachment of their property pursuant to the Foreign Sovereign Immunities Act of 1976, Act of October 21, 1976, Pub.L. 94–583, 90 Stat. 2891, (codified at 28 U.S.C. §§ 1330; 1332(a)(2)–1332(a)(4); 1391(f); 1441(d); and 1602–1611 (1976)) ("FSIA" or "Act"), and dissolving an injunction against negotiating certain letters of credit.

The questions presented on this appeal are, first, whether Masin and the Romanian Bank come within the definition of "agency or instrumentality of a foreign state" set forth in § 1603(b) of the Act, and therefore are immunized by the Act from prejudgment attachment; second, if the protections of the Act apply, whether that statutory immunity was "explicitly" waived in accordance with § 1610(d)(1) of the Act; and, third, whether the district court correctly refused to grant, by injunction, relief which it could not properly provide by attachment.

The district court in a reasoned opinion held that Masin and the Romanian Bank were protected under the Act, that Romania did not explicitly waive immunity, and that an injunction could not be used to immobilize defendants' assets when an attachment of those assets would be improper. We affirm.

I.

In the summer of 1981, Masin, a Romanian foreign trading company, delivered Romanian-made lathes, drills, and machine parts to S & S, a domestic corporation. Pursuant to the purchase agreement, S & S paid for this material by certain irrevocable letters of credit issued to the Romanian bank—as Masin's collection agent—for the account of Masin. S & S was not satisfied with the quality of the material delivered. It commenced an action on July 15, 1982 in the Supreme Court of the State of New York, New York County, to recover damages resulting from Masin's allegedly defective performance under the purchase agreement. Concurrent with commencement of this action, S & S applied for an order of attachment authorizing a levy upon assets

in the United States owned by Masin and the Romanian Bank. The state court granted the order of attachment, pursuant to N.Y.Civ.Prac.Law § 6201(1) (McKinney 1980), authorizing the New York County Sheriff to levy upon property owned by defendants up to the amount of $1,042,146. The next morning the Sheriff levied upon assets owned by defendants at The Bankers Trust Company in New York City.

On July 21, S & S moved in the state court to confirm the attachment. Masin and the Romanian Bank thereupon sought to remove the action to the federal court on the ground of diversity of citizenship (more accurately, alienage). They also sought in the federal court to vacate the attachment of their assets. After their removal petition was filed in the federal court, 28 U.S.C. § 1446(a) (1976), defendants obtained from the federal court an order, which was served on S & S on July 27, requiring it to show cause why the action should not be removed to the federal courts and why the attachment should not be vacated. After a hearing, 28 U.S.C. § 1446(c)(5) (1976), the district court on July 29 granted defendants' motion to remove the action but continued the state court's order of attachment with certain modifications. The district court also enjoined "any and all negotiation of drafts of other negotiable paper pursuant to the ... letters of credit."

By a notice of motion dated September 13, defendants renewed their efforts to vacate the attachment and to dissolve the injunction against negotiation of the letters of credit. This motion, among other things, also sought dismissal of the action for want of in personam jurisdiction over defendants, or, in the alternative, a stay of the action and an order to compel the parties to arbitrate.

On December 7, the court filed a Memorandum and Order vacating the order of attachment and dissolving the injunction against negotiation of the letters of credit. The court held that Masin and the Romanian Bank were protected by the FSIA as agents or instrumentalities of the Romanian government, and that their statutory immunity from prejudgment attachment had not been explicitly waived in accordance with § 1610(d)(1) of the Act. The court refused to dismiss the action. It referred the question of in personam jurisdiction over the Romanian Bank to a magistrate. It refused to grant a stay or to compel arbitration.

Recognizing the possibility that the entire action—and any appeal from his order—might be mooted upon the vacating of the attachment, Judge Knapp stayed until January 4, 1983 that part of his December 7 order which vacated the attachment. On January 4, we granted S & S' motion to continue the stay until this appeal could be heard and decided.

## II.

The Foreign Sovereign Immunities Act immunizes a "foreign state" from prejudgment attachment of its assets in the United States, unless that state explicitly waives its immunity. 28 U.S.C. §§ 1609, 1610(d) (1976). More than the foreign state itself is protected by the Act; its alter egos likewise are immunized. As § 1603(a) makes clear, an "agency or instrumentality of a foreign state as elaborated in subsection (b)" itself is treated as a foreign state for the purposes of the Act. A threshold question is whether Masin and the Romanian Bank qualify as state agencies or instrumentalities, and therefore are immune from prejudgment attachment of their assets in this country.

The Act defines an "agency or instrumentality of a foreign state" to mean any entity

"(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country."

28 U.S.C. § 1603(b) (1976). The legislative history elaborates on the kinds of economic entities the drafters intended to include in the definition of agency or instrumentality:

> "[A]s a general matter, entities which meet the definition of an agency or instrumentality of a foreign state could assume a variety of forms, including a state trading corporation ... a central bank [or] export association...."

H.R.Rep. No. 1487, 94th Cong., 2d Sess. 15–16, *reprinted in* 1976 U.S.Code Cong. & Ad.News 6604, 6614.

There is no doubt that Masin and the Romanian Bank each satisfies parts (1) and (3) of the statutory test. The sole dispute turns on the application of part (2) to the facts of this case. S & S claims that appellees failed to prove either that they are organs of the Romanian state or that they are owned by Romania. We disagree. The proof of state ownership and state control that was introduced in the district court amply supports the court's holding that both Masin and the Romanian Bank are agencies or instrumentalities of Romania for the purposes of the Act. We shall consider the proof as to each appellee in turn.

### (A) *The Romanian Bank*

■ It would be difficult to imagine a clearer example of a state "agency or instrumentality", as defined in § 1603(b), than the Romanian Bank for Foreign Trade. This entity is specifically defined by Romanian law as a central state institution whose mission is to effect state goals concerning payments, credit, and currency control in foreign trade. Lege, Privind Infinitarea, Organizarea Si Functionarea Bancii Romane de Comert Exterior, art. 1 (Law No. 16 of June 21, 1968). Furthermore, by virtue of the Romanian Constitution, all banks are "State property".[1] Constitutie art. VII (Romania). This evidence alone is sufficient to prove that the Romanian Bank

is a state-owned instrumentality established to serve the state's foreign trade goals. Indeed this is the paradigm of a state agency or instrumentality, as indicated by the House Report, which specifically identified state central banks and export associations in its discussion of qualifying entities for purposes of § 1603(b). H.R.Rep. No. 1487, *supra,* at 15–16, 1976 U.S.Code Cong. & Ad.News, at 6614. State-owned central banks indisputably are included in the § 1603(b) definition of "agency or instrumentality." *Banco Nacional de Cuba v. Chase Manhattan Bank,* 505 F.Supp. 412, 428 (S.D.N.Y.1981) (an analogous institution, the Banco Comercio Exterior de Cuba, held to be an instrumentality of the Cuban government).

There was additional evidence of the Bank's state-ownership and its position as a state foreign trade organ. The uncontroverted affidavits of Sava, Consul to the Socialist Republic of Romania, of Radu, the managing director of the Bank, and of Herscovici, an expert on Romanian law, corroborated the Bank's assertion that it is owned by the state and that it serves the foreign trade goals of the state. Finally, a report published by the United States Department of Commerce characterizes the Romanian Bank in the same terms.[2]

S & S failed to rebut any of this persuasive evidence, arguing instead that more was required to prove agency or instrumentality status. We disagree. Convincing and uncontroverted evidence established that the Bank is but a cat's paw of the Romanian government—an instrumentality owned and controlled by the state.

### (B) *Masin*

■ State trading companies and export associations were identified specifically in the House Report as exemplars of the § 1603(b) definition of "agency or instru-

---

1. We previously have held that corporations in which the state has a *majority* interest are within the § 1603(b) definition. *Carey v. National Oil Corp.,* 592 F.2d 673, 676 n. 1 (2 Cir.1979).

2. Domestic and International Business Administration, United States Department of Commerce, Overseas Business Reports 73–36, Trading and Investing in Romania 8 (Aug. 1973).

mentality." H.R.Rep. No. 1487, *supra,* at 15–16, 1976 U.S.Code Cong. & Ad.News, at 6614. Masin adduced convincing and uncontroverted evidence that it is a wholly state-owned export/import company, established to carry out the foreign trade goals of the state. Sava, the Romanian Consul, stated in his affidavit that Masin "is a state foreign trade company wholly-owned and controlled by the Romanian Government." Although S & S belittles this sworn statement as the catechism of a brainwashed functionary, statements of foreign officials—regardless of their political or ideological orientation—have been accorded great weight in determining whether an entity is entitled to claim the protection of the FSIA. *Yessenin-Volpin v. Novosti Press Agency,* 443 F.Supp. 849, 854 (S.D.N.Y. 1978). Sava's conclusion, moreover, was corroborated by Straus, manager of Masin, and by Herscovici, an expert on Romanian law, each of whom submitted affidavits to the same effect. While the objectivity of these men might be questioned, their uncontroverted explanations of the status of Masin were plausible as well as consistent with the other evidence.

Putting aside the veracity of the affiants, the district court based its decision on more than these sworn statements. Masin introduced a variety of material detailing the role of the Romanian state in foreign trade. For example, Article 8 of the Romanian Constitution provides that foreign trade is a state monopoly. Constitutie art. VIII (Romania). The Romanian government itself has described the hand-in-glove relationship of the state and its subordinate "economic units" in the conduct of foreign trade. *See generally Law on Foreign Trade and Technico-Scientific Cooperation Activities in the Socialist Republic of Romania,* in Official Bulletin of the Socialist Republic of Roman-

ia No. 33 (1971). This view is reflected in a report published by the United States Department of Commerce, which classified Masin as a subordinate of the Romanian Ministry of Machine Tools and Electronics. *Trading and Investing in Romania,* note 2 *supra,* at 7. The report reiterates that "[f]oreign trade in Romania is monopolized by the state and supervised by the Ministry of Foreign Trade." *Id.* at 5–6.

S & S claims that only the presumption of state ownership that exists in all socialist economies supports the conclusion that Masin is an agency or an instrumentality of the state. Relying on *Edlow International Co. v. Nuklearna Elektrarna Krsko,* 441 F.Supp. 827 (D.D.C.1977), S & S argues that this presumption is not enough, since there are entities even in socialist economies that are distinct from the state.[3]

We may assume for present purposes that there are essentially private entities operating within socialist economies. This does not alter our holding that the district court correctly concluded that Masin is an agency or instrumentality of the state. For unlike *Edlow,* where only the presumption of state ownership was relied upon to prove agency or instrumentality status, Masin established its status as a state-owned and state-controlled trading company with specific evidence. Such a state trading company expressly qualifies as an "agency or instrumentality" of the state, as the legislative history makes plain.

We hold that both the Romanian Bank and Masin are agencies or instrumentalities of Romania within the meaning of FSIA.

### III.

Having held that the district court correctly concluded that the Romanian Bank and Masin are agencies or instrumen-

---

**3.** Aside from the fact that *Edlow* is not controlling on this Court, the evidence before that court is sharply distinguishable from that in the instant case. *Edlow* involved a Yugoslavian "work organization". The district court found that this "work organization" was not an "agency or instrumentality" of the Yugoslavian state, largely because a presumption of state ownership of all property—Yugoslavia being a

socialist state—was the *only* proof of government ownership or control offered. As that court stated, "[t]he only basis, therefore, for concluding that NEK is an 'organ' of the Yugoslav government, or at least 50 per cent owned by the government, is that the state 'owns' all forms of property in Yugoslavia." 441 F.Supp. at 832.

talities of the Romanian state, it follows that they are entitled to protection as "foreign state[s]" within the meaning of § 1603(a) of the Act. Among the protections accorded to foreign states by the Act is the immunity from attachment provided in § 1609:

> "Subject to existing international agreements to which the United States is a party at the time of enactment of this Act the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter."

28 U.S.C. § 1609 (1976). Foreign states accordingly are immune from prejudgment attachment of their assets in the United States, unless the immunity is explicitly waived as provided in § 1610(d):

> "(d) The property of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment prior to the entry of judgment in any action brought in a court of the United States or of a State ... if—
>
> (1) the foreign state has *explicitly waived* its immunity from attachment prior to judgment, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, and·
>
> (2) the purpose of the attachment is to secure satisfaction of a judgment that has been or may ultimately be entered against the foreign state, and not to obtain jurisdiction." (emphasis added).

*Libra Bank Ltd. v. Banco Nacional de Costa Rica,* 676 F.2d 47, 49 (2 Cir.1982). The

requirement that the waiver of immunity from prejudgment attachment be *explicitly* made is underscored both by the plain language of § 1610(d) and by the contrast between § 1610(d) and § 1610(a).[4] A foreign state's immunity from attachment as an aid in the execution of judgment can be waived implicitly as well as explicitly, while the immunity from *prejudgment attachment* can be waived only by unmistakable and plain language. *Id.* at 49–50 & n. 4 (discussing statute and legislative history).

In *Libra Bank* we held ·that a foreign state did not have to intone the precise words "prejudgment attachment" in order to waive immunity. *Id.* at 49–50. We held in *Libra Bank,* however, and we reiterate here, that a waiver of immunity from prejudgment attachment must be explicit in the common sense meaning of that term: the asserted waiver must demonstrate unambiguously the foreign state's intention to waive its immunity from prejudgment attachment in this country. We do not take lightly the congressional demand for explicitness. It would be improper for a court to subvert this directive by substituting a judicially reconstituted gloss on a facially unclear document for an unequivocal waiver by the foreign state.

■  The question we must decide here is whether Romania. *explicitly* has waived its immunity from prejudgment attachment. S & S claims that an explicit waiver of immunity can be found in the "Business Facilitation" clause of the subsisting United States-Romania trade agreement, which provides that

> · "Nationals, firms, companies and economic organizations of either Party shall be afforded access to all courts, and, when

---

4.  Section 1610(a) in relevant part provides:
    > "(a) The property in the United States of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if—
    >
    > (1) the foreign.state has waived its immunity from attachment in aid of execution or

from execution either explicitly or by implication, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, or
    > (2) the property is or was used for the commercial activity upon which the claim is based, or
    > . . . . ."

applicable, to administrative bodies as plaintiffs and defendants, or otherwise, in accordance with the laws in force in the territory of such other Party. They shall not claim or enjoy immunities from suit or execution of judgment or other liability in the territory of the other Party with respect to commercial or financial transactions, except as may be provided in other bilateral agreements."

Agreement on Trade Relations Between the United States and the Romanian Government, April 2, 1975, Art. IV, ¶ 2, 26 U.S.T. 2305, 2308–09, T.I.A.S. No. 8159. Obviously waivers of immunity from suit or from execution of judgment have no bearing upon the question of immunity from prejudgment attachment. The only language in the above treaty that might be construed as a waiver of immunity from prejudgment attachment is the waiver of immunity from "other liability in the territory of the other Party".

The treaty between the United States and Romania itself provides no clue as to what was meant to be included in the category "other liability". Other courts do not appear to have had the occasion to construe this treaty. Since an identical clause is found in the Treaty of Amity between the United States and Iran, however, we turn for guidance to that treaty and what interpretation thereof there has been. In relevant part, the Treaty of Amity provides:

"No enterprise of either [the United States or Iran] .... shall, if it engages in commercial, industrial, shipping or other business activities within the territories of the other High Contracting Party, claim or enjoy, either for itself or for its property, immunity therein from taxation, suit, execution from judgment *or other liability* to which privately owned and controlled enterprises are subject therein."

Treaty of Amity, Aug. 15, 1955, United States-Iran, Art. XI, ¶ 4, 8 U.S.T. 899, 909, T.I.A.S. No. 3853 (emphasis added). Referring to the clause "or other liability" in the Treaty of Amity, we stated in *Libra Bank,* although we were not there required to

decide the matter, that "[t]he weight of authority is that this provision—and in particular the phrase 'other liability'—is not an explicit waiver of immunity from prejudgment attachment." 676 F.2d at 50 (citations omitted).

We must now decide in the instant case the question to which we intimated an answer by way of dictum in *Libra Bank.* We hold that the waiver of immunity from "other liability" does not explicitly waive immunity from prejudgment attachment. The phrase "other liability" is ill-suited to encompass prejudgment attachments. As we pointed out in *Libra Bank,* it is by no means clear that prejudgment attachments are liabilities. The better view seems to be that such attachments, outside of their now-discredited use in *quasi in rem* jurisdiction, are provisional remedies authorized to assure that prevailing parties will have meaningful recoveries. 7 Moore's Federal Practice ¶ 64.04[3], at 64–19 (2d ed. 1982). We are not required to decide today the precise role of prejudgment attachments. We hold only that the "other liability" language does not unequivocally express the will of the parties to waive immunity from prejudgment attachment.

In so holding, we are in accord with the majority of courts (all district courts) that have addressed the issue. *Security Pacific National Bank v. Iran,* 513 F.Supp. 864, 879–80 (C.D.Cal.1981); *New England Merchants National Bank v. Iran Power Generation & Transmission Co.,* 502 F.Supp. 120, 126–27 (S.D.N.Y.1981), *remanded on other grounds,* 646 F.2d 779 (2 Cir.1981); *E-Systems, Inc. v. Islamic Republic of Iran,* 491 F.Supp. 1294, 1300–02 (N.D.Tex.1980); *Reading & Bates Corp. v. National Iranian Oil Co.,* 478 F.Supp. 724, 728 (S.D.N.Y.1979); *Behring International, Inc. v. Imperial Iranian Air Force,* 475 F.Supp. 383, 392–93 (D.N.J.1979) (holding that the waiver of immunity from "other liability" did not explicitly waive immunity from prejudgment attachment, but supporting the attachment on other grounds). *Contra, Reading & Bates Drilling Co. v. National Iranian Oil Co.,* No. 79 Civ. 6034 (S.D.N.Y. November

29, 1979) (bench ruling); *Electronic Data Systems Corp. v. Social Security Organization of the Government of Iran,* No. 79 Civ. 1711 (S.D.N.Y. May 23, 1979) (bench ruling), *remanded on other grounds,* 610 F.2d 94 (2 Cir.1979).

S & S claims that *Libra Bank* requires reversal in the instant case because in *Libra Bank* we held that immunity had been waived even though the words "prejudgment attachment" had not been intoned. In *Libra Bank,* however, the language of the agreement was virtually all-inclusive, waiving "any right or immunity from legal proceedings." 676 F.2d at 49. Such an expansive waiver is hardly comparable to the scant and hazy "other liability" language of the United States-Romania Trade Agreement.

We hold, in view of the delphic character of the phrase "other liability", that the Romanian Bank and Masin did not explicitly waive their immunity from prejudgment attachment.

### IV.

This brings us to the final question presented on this appeal, namely, whether the district court correctly dissolved the injunction which enjoined negotiating the letters of credit. We hold that it did.

■ The short answer to S & S' argument that the district court should have continued the injunction is that such a measure could only have resulted in the disingenuous flouting of the FSIA ban on prejudgment attachment of assets belonging to a "foreign state". Once the district court held—correctly so in our opinion— that the Romanian Bank and Masin were protected from prejudgment attachment by the FSIA, the court properly refused to sanction any other means to effect the same result. The FSIA would become meaningless if courts could eviscerate its protections merely by denominating their restraints as injunctions against the negotiation or use of property rather than as attachments of that property.

■ We hold that courts in this context may not grant, by injunction, relief which they may not provide by attachment. The injunction was properly dissolved.

Our stay of January 4, 1983, which continued the district court's stay of that part of its order of December 7, 1982 vacating the attachment, is dissolved.

The mandate shall issue forthwith.

Affirmed.