FERROSTAAL METALS
CORPORATION,
Plaintiff,
v.
S.S. LASH PACIFICO, her
engines, boilers, etc.,
v.
PRUDENTIAL LINES, INC., Defendant
and Third Party Plaintiff,
v.
METAL IMPORTEXPORT and Intreprin-
derea Exploatare Portuara Pentru Pro-
duse Metalurgice, Third Party Defend-
ants.

FERROSTAAL METALS
CORPORATION,
Plaintiff,

v.

KENNEDY TUBULAR PRODUCTS,
INC., Defendant,

v.

AETNA INSURANCE COMPANY, Amer-
icas Insurance Company, Century In-
demnity Company, Fireman's Fund In-
surance Co., Highlands Insurance Co.,
Northwestern National Insurance Com-
pany, Talbot Bird & Company, Inc. and
Defendants and Third Party Plaintiffs,

v.

METAL IMPORTEXPORT and Interprin-
derea Exploatare Portuara Pentra Pro-
duse Metalurgice, Third Party Defend-
ants.

PRUDENTIAL LINES, INC., S.S. Lash
Pacifico, her engines, boilers, etc.,
Fourth Party Plaintiffs,
v.
METAL IMPORTEXPORT and Intreprin-
derea Exploatare Portuara Pentru Pro-
duse Metalurgice, Fourth Party De-
fendants.

Nos. 82 Civ. 2825 (CBM), 83 Civ.
1524 (CBM).

United States District Court,
S.D. New York.

Jan. 21, 1987.

Lilly Sullivan Purcell Barkan & Junge, P.C., New York City (Philis S. Ross, of counsel), for Prudential Lines, Inc., defendant and third party plaintiff.

Burke & Parsons, New York City (Stephen P. Kyne, of counsel), for Metal Importexport, third party defendants.

## OPINION

STANTON, District Judge.

The main questions presented by the pending application are *first* whether prior court approval was required before attachments were made against assets of a claimed agent of a foreign sovereign and *second* whether the beneficiary's interest in open letters of credit were subject to effective attachment.

For the reasons which appear hereafter, the first question is answered in the affirmative and the second in the negative.

## BACKGROUND

Prudential Lines, Inc. ("PLI"), a judgment creditor, served restraining notices upon various New York and New Jersey banks enjoining their payment under any open letter of credit which named Metal Importexport ("MIE"), the judgment debtor, as the beneficiary. MIE claims that it is an agency of Romania and that the restraining notices were invalid because they were not preceded by a court order in accordance with the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602 *et seq.* ("the Act"). Even if the restraining notices were otherwise valid, MIE argues, they are ineffective against the type of asset represented by an open letter of credit. PLI asserts that MIE is not an agency of Romania and that even if MIE were protected by the Act, the required court order can be granted *nunc pro tunc.* PLI urges that open letters of credit can be attached under the court's equitable powers, and should be, in this instance, since

MIE's only assets in this district are the letters of credit of which it is the beneficiary, so if attachment is not allowed MIE will be effectively judgment-proof and PLI left without a remedy.

The questions arose in the following manner. Plaintiff Ferrostaal Metals Corporation sued PLI for damage to a shipment of seamless pipes. PLI brought in MIE, the supplier of the pipes, claiming that the damage was the result of MIE's negligence. MIE, after service of an answer, failed to comply with PLI's discovery requests and suffered a default judgment. In the process of executing on its judgment, PLI learned that various local banks had been caused by purchasers of steel either to issue or to confirm letters of credit in favor of MIE, under which MIE or its agents would be paid upon presentment of proper bills of lading. Without further ado, PLI served restraining notices pursuant to N.Y.C.P.L.R. § 5222 (McKinney 1978) on the New York banks who had either issued or confirmed the letters of credit. After protest by MIE, PLI obtained from this court on March 19, 1986, a temporary restraining order preventing the banks from transferring any property in which MIE had an interest, including payment under any open letter of credit, until determination of the underlying motion for permission to serve restraining notices upon the banks *nunc pro tunc* as of March 1, 1986 and for other relief.

Because of the terms of settlement agreements between the parties, the effect of a decision of these questions will determine the validity of attorneys' liens asserted against funds obtained through attachments by the restraining orders on open letters of credit, and thus resolve the only remaining issue in this case.

1.

The Act protects an agency or instrumentality of a foreign state from post-judgment attachments unless its immunity is either explicitly or implicitly waived. The Act defines an agency or instrumentality as a separate legal person, corporate or otherwise, which is either an organ of a

foreign state or owned by one, and not a citizen under the laws of any nation except the foreign state in question. 28 U.S.C. § 1603(b).

■ MIE is a Romanian foreign trade organization which exports and imports steel products. MIE claims that as a foreign trade company, it qualifies as an agency or instrumentality of the Romanian government. It argues that like most East European socialist nations, Romania's economy is highly centralized and all foreign trade is conducted by the Ministry of Foreign Trade through wholly state-owned foreign trade organizations, of which MIE is one. MIE cites Article 8 of the Romanian Constitution which states in its entirety that "Foreign trade is a state monopoly", and a report on trading and investing in Romania issued by the United States Department of Commerce which describes the subordinate role of foreign trade companies, including MIE. Kyne Aff. sworn to March 21, 1986 ¶¶ 7–8, Exh. 5–6.

PLI argues that MIE is neither an agency nor an instrumentality of the Romanian government, but rather an independent and autonomous entity. Decree 199 of 1949 of the Romanian Socialist Republic regarding state enterprises provides that each such company is liable to creditors with its own assets, and conducts business in its own name. Decree 31 of 1954 provides that Romanian commercial entities, including foreign trade companies such as MIE, have their own budgets, assets and liabilities and enter into contracts in their own name and not that of the Romanian government. Section 21 of Law 1 of 1971 provides for establishment of economic units authorized directly to carry out foreign trade, and section 60 provides that foreign trade economic units shall have autonomy in marketing, selecting foreign partners, and in negotiating contracts. Herescu Aff. sworn to March 24 and April 8, 1986, ¶¶ 4–6.

The issue whether a Romanian foreign trade company is protected by the Act has been resolved for this circuit by *S & S Machinery Co. v. Masinexportimport*, 706 F.2d 411 (2d Cir.), *cert. denied*, 464 U.S. 850, 104 S.Ct. 161, 78 L.Ed.2d 147 (1983). The Court of Appeals held that Masinexportimport ("Masin"), a Romanian foreign trade company which exports lathes, drills and machine parts, qualified as an agency or instrumentality of the state. *Id.* at 415. The determination relied upon (1) the legislative history of the Act which specifically identifies state trading companies and export associations as exemplars of an agency or instrumentality, (2) affidavits stating that Masin was a state foreign trade company wholly owned and controlled by the Romanian government, (3) Article 8 of the Romanian Constitution (see above), (4) an official Romanian bulletin describing the "hand-in-glove" relationship between the state and its subordinate economic units in the conduct of foreign trade, and (5) a report, published by the United States Department of Commerce, classifying Masin as a subordinate of the Romanian Ministry of Machine Tools & Electronics. *Ibid.*

Granting PLI's argument that foreign trade companies are independent entities with their own automony does not remove them from the Act's protection. The U.S. Commerce Department report on Trading and Investing in Romania, cited in *S & S Machinery*, recognizes the corporate independence of foreign trade companies, but nonetheless describes their activities as subordinated to the applicable state ministry. The report describes MIE and other foreign trade companies as "the equivalent of an import-export department in a western firm." International Marketing Information Series, United States Department of Commerce, Overseas Business Reports, 78–33, Trading and Investing in Romania 7–8 (Sept. 1978).

Accordingly, under the holding of *S & S Machinery*, MIE is protected by the Act.

■ Nevertheless, MIE's property can be attached for execution of a judgment, because Romania explicitly waived its immunity from postjudgment attachment in the Agreement on Trade Relations Between the United States and the Romanian Government:

Nationals, firms, companies and economic organizations of either Party shall be afforded access to all courts, and, when applicable, to administrative bodies as plaintiffs and defendants, or otherwise, in accordance with the laws in force in the territory of such other Party. They shall not claim or enjoy immunities from suit or execution of judgment or other liability in the territory of the other Party with respect to commercial or financial transactions, except as may be provided in other bilateral agreements.

Agreement on Trade Between the United States and the Romanian Government, April 2, 1975, Art. IV, ¶ 2, 26 U.S.T. 2305, 2308–09, T.I.A.S. No. 8159.

However, when a foreign state has waived its immunity from postjudgment attachment, the Act requires that attachment can occur only by court order. This order is issued, if at all, after the court has "determined that a reasonable period of time has elapsed following the entry of judgment...." 28 U.S.C. § 1610(c). The House Report on the Act explains the necessity of this requirement and the factors a court should consider:

In some jurisdictions in the United States, attachment and execution to satisfy a judgment may be had simply by applying to a clerk or to a local sheriff. This would not afford sufficient protection to a foreign state. This subsection contemplates that the courts will exercise their discretion in permitting execution. Prior to ordering attachment and execution, the court must determine that a reasonable period of time has elapsed following the entry of judgment, or in cases of a default judgment, since notice of the judgment was given to the foreign state under section 1608(e). In determining whether the period has been reasonable, the courts should take into account procedures, including legislation, that may be necessary for payment of a judgment by a foreign state, which may take several months; representations by the foreign state of steps being taken to satisfy the judgment; or any steps being taken to satisfy the judgment; or evidence that the foreign state is about to remove assets from the jurisdiction to frustrate satisfaction of the judgment.

H.R.Rep. No. 1487, 94th Cong., 2d Sess. 30, *reprinted in* 1976 U.S.Code Cong. & Ad. News 6604, 6629.

The *ex parte* restraining notices served by PLI in early March are just the type of restraining notices against which § 1610(c) of the Act protects foreign states. Section 5222 of the N.Y.C.P.L.R. permits restraining notices to be issued by either the clerk of court or the attorney for the judgment creditor as officer of the court. Accordingly, these notices did not comply with the Act and thus did not effectively restrain any of MIE's property.

A court order permitting attachment of MIE's property as of March 19th would have issued, because by that date the statutory purpose of § 1610(c) of the Act had been accomplished.

Judgment was entered against MIE on December 19, 1985 and was still unsatisfied as of March 19, 1986. In January of 1986 discussions regarding satisfaction of the judgment were held between MIE and PLI, during which PLI indicated that it would be willing to settle for less than the full amount. As of March 19th, MIE had made no affirmative response or counter offer, nor any representation that steps were being taken to satisfy the judgment. Herescu Aff. sworn to March 24, 1986 ¶¶ 9–13. The court finds that as of March 19, 1986, a reasonable period of time, within the contemplation of the Act, had elapsed.

Nonetheless, PLI's argument that the required order permitting attachment can be granted *nunc pro tunc* as of March 1, 1986, is not persuasive. The first court action regarding the attachment of MIE's property occurred on March 19, 1986, with the issuance of a temporary restraining order. *"Nunc pro tunc"* describes the court's inherent power to make its record speak the truth, *i.e.*, to record what was actually done but not recorded. *See* BLACK'S LAW DICTIONARY 964 (5th ed. 1979) (citing cases). A *nunc pro tunc*

entry cannot be used to supply action in the place of nonaction on the part of the court. *Simmons v. Atlantic Coast Line R.R. Co.*, 235 F.Supp. 325, 330 (E.D.S.C.1964), (quoting *Stubbs v. Mendel*, 148 Ga. 802, 98 S.E. 476 (1919)).

The concept cannot apply here, since prior to March 19, 1986, the court had not taken any action regarding the attachment of MIE's property.

Accordingly, the earliest time a valid restraint on MIE's property could have occurred is March 19, 1986.

### 2.

PLI claims that MIE's only property in New York are the open letters of credit, issued or confirmed by various local banks, which name MIE as the beneficiary.

A letter of credit is an instrument by which a bank or other issuer, at the request of its customer, engages that it will honor demands for payment upon proper presentment of documents. (A confirming bank undertakes the same obligations assumed by the issuer, or engages that the issuer will perform those obligations.) The essential function of the letter of credit is to substitute the credit of the issuer for the credit of its customer, often a buyer of goods. As a result, the beneficiary of the credit, typically a seller of goods, as MIE is in this case, is assured payment upon proper presentment of the documents required by the terms of the letter of credit. The issuer is not concerned with the proper performance of the underlying contract, but rather is concerned with the apparent compliance of the required documents with the terms of the letter of credit. A letter of credit is an "open" one until presentment of the proper documents. *See generally*, H. Harfield, *Letters of Credit* 1–23 (1979).

▮ Section 1610 of the Act permits postjudgment attachment of property used for a commercial activity in the United States. The provisions of the Act itself offer no guidance in resolving the issue presented here: whether the interest of a foreign beneficiary in an open letter of credit can be effectively attached.

Recently, courts in this circuit considered New York law in determining the validity of a maritime garnishment served before the garnishee came into possession of the property to be garnished, because precedent under federal law was minimal. *See Reibor Int'l Ltd. v. Cargo Carriers (KACZ–CO.) Ltd.*, 759 F.2d 262 (2d Cir. 1985). The Court of Appeals recognized New York law as appropriate where federal precedents were sparse, since New York is the situs for multiple transactions in world commerce and its banking system vulnerable to disruption by divergences between state and federal attachment law. *Id.* at 266–67. Under New York law it is clear that attachment on an open letter of credit is fruitless, since a levy is absolutely void unless the debt is owed *at the time of service of the order of attachment, see id.* at 266, 268, which by definition is not the case when the letter of credit is "open."

In *Diakan Love, S.A. v. Al-Haddad Bros. Enterprises, Inc.*, 584 F.Supp. 782 (S.D.N.Y.1984), this court (Leval, J.) vacated an attachment pursuant to the Admiralty Rules of a beneficiary's interest in an open letter of credit. The court held that the interest of a beneficiary in an open letter of credit was not attachable as a debt or property since prior to the presentation of conforming documents, a confirming bank is neither indebted to the beneficiary nor holds any of its property. *Id.* at 784; *accord, Supreme Merchandise Co. v. Chemical Bank*, 117 A.D.2d 424, 503 N.Y. S.2d 9 (1st Dept.1986). Central to the vacation of the attachment, however, were the importance of letters of credit to international trade and the uncertainties which would result if attachments of open letters of credit were permitted. Thus the court, after describing a number of circumstances in which conventional foreign trade financing would be frustrated by allowing such attachments, stated:

In all such cases, the expectations supported by letters of credit will be unfulfilled. It is likely that the entire chain of

interlinked contracts necessary to accomplish a completed purchase and sale in international trade will be frustrated. Innocent parties will be injured. Law suits will proliferate. But most importantly, if uncertainties of this order surround letters of credit, financiers will cease to extend credit in reliance on them. Such letters will cease to perform their essential role in facilitating international trade, which as a result will be very substantially impaired.

*Diakan*, 584 F.Supp. at 786. The same question has arisen in the bankruptcy setting, and those courts have reached a similar conclusion. *See In re North Shore & Central Illinois Freight Co.*, 30 B.R. 377 (Bkrtcy.N.D.Ill.1983); *In re Planes, Inc.*, 29 B.R. 370 (Bkrtcy.N.D.Ga.1983); *In re M.J. Sales & Distributing Co.*, 25 B.R. 608 (Bkrtcy.S.D.N.Y.1982); *In re Page*, 18 B.R. 713 (D.C.D.C.1982). *But see In re Twist Cap, Inc.*, 1 B.R. 284 (Bkrtcy.D.Fla.1979).

While PLI acknowledges that generally open letters of credit are not attachable property of the beneficiary, it argues that the court can attach the open letters of credit in this case pursuant to its equitable powers. Unless the court permits such attachments, PLI argues, PLI will be without a remedy because MIE's only assets in the district are open letters of credit. According to PLI the *Diakan* decision does not prevent the attachments because the concerns discussed by the district court in *Diakan* involving the consequences of restraining open letters of credit are not present in this case. The circumstances described in *Diakan* included the effects of attachments on banks paying under a letter of credit negotiated to them in confidence that the issuing bank stands liable, on banks that issued back-to-back letters, and on the purchasers of goods when a beneficiary assigned its rights to receive proceeds, *Diakan*, 584 F.Supp at 785, which are not present here. However, these circumstances should be read not as limiting the holding in *Diakan* but as illustrations of the crucial point that attachment of open letters of credit can interfere with entire chains of interlinked contracts, thereby substantially impairing the important role they play in international trade.

Courts have enjoined performance of open letters of credit only upon a showing of fraud by the beneficiary in drawing on the letter and where no "holder in due course" interests were involved. *See KMW Int'l v. Chase Manhattan Bank*, 606 F.2d 10, 16 (2d Cir.1979); *Diakan*, 584 F.Supp. at 786 (cases cited). No such evidence is presented here.

Accordingly, the temporary restraining order issued on March 19, 1986 is vacated as a matter of law, and any sums obtained for PLI's account in reliance upon that order must be returned to the garnishee.

## CONCLUSION

The sole remaining issues having been thus determined, the Clerk is directed to close the case.