**GADSBY & HANNAH, Plaintiff,**

v.

**SOCIALIST REPUBLIC OF ROMANIA, Defendant.**

**No. 87 Civ. 6564 (CSH).**

United States District Court, S.D. New York.

Oct. 19, 1988.

Thomas G. Amon, Gadsby & Hannah, New York City, for plaintiff.

Radu Herescu, New York City, for defendant Romanian Bank for Foreign Trade.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiff Gadsby & Hannah ("G & H"), a law firm, commenced this action against defendant Socialist Republic of Romania ("Romania") to recover for unpaid legal fees. Having recovered a judgment in the amount of $233,103.75,[1] plaintiff undertook the steps which give rise to the motions addressed by this Opinion.

### Background

On September 1, 1988, G & H served an "information subpoena"[2] on Romania,[3] upon the Romanian Bank for Foreign Trade ("Romanian Bank") as well as on all of the major New York banks. The subpoena was intended to provide information about assets available in New York that could be used to satisfy plaintiff's judgment. Also on September 1, 1988, G & H served "restraining notices"[4] on the Romanian Bank and all of the major New York banks. As a result, five commercial banks orally notified G & H that money was on account for the Romanian Bank and would be restrained pursuant to the notices served by plaintiff law firm. On September 15, 1988, G & H secured executions on these five banks, allegedly pursuant to CPLR § 5232.

National Westminster Bank ("NatWest"), one of the five commercial banks restraining money of the Romanian Bank, apparently requested[5] that G & H institute a "turnover proceeding" pursuant to CPLR § 5225(b) so that NatWest could be certain it would not "be subject ... to potential double liability to the Romanian Bank." Affirmation of NatWest in Response to Order to Show Cause at Eighth Paragraph. This turnover proceeding was brought in the form of an Order to Show Cause, which was heard on September 29, 1988.

By a further Order to Show Cause heard October 4, 1988, G & H seeks a court order directing the deposition of Minister Toader Rapanu so that it might gain information regarding, among other things, the relationship between Romania and the Romanian Bank. Mr. Alexandru Logofatu, Assistant to the Economic Counselor, by letter dated October 4, 1988, asserts full diplomatic immunity on Minister Rapanu's behalf.

By cross-Order to Show Cause signed and heard on October 4, 1988, the Romanian Bank seeks an order vacating the writ of execution and the restraining notices served on various New York banks restraining accounts of the Romanian bank.

### Discussion

The Foreign Sovereign Immunities Act of 1976 ("FSIA") protects the property of an agency or instrumentality of a foreign state from postjudgment attachment. 28 U.S.C. § 1609. The FSIA defines an agent or instrumentality of a foreign state as any entity:

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other owner-

---

1. As per this Court's Memorandum Endorsement of July 20, 1988, G & H noticed settlement of judgment on August 5, 1988. Service of the proposed judgment was made on the Romanian Mission in New York City. Romania failed to appear and Gadsby and Hannah's proposed judgment was signed and entered on September 1, 1988.

2. Such subpoenas were purportedly served pursuant to Rule 69(a) of the Federal Rules of Civil Procedure and § 5224(a) of the New York Civil Practice Law and Rules ("CPLR").

3. Service on Romania was effected by serving all papers on the Mission maintained by Romania in New York City.

4. Romania was not served with the restraining notice; authority for such service allegedly derives from CPLR § 5222.

5. Verified Petition submitted in support of G & H's Order to Show Cause of September 16, 1988 at ¶ 4.

ship interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603.

■■■ The Romanian Bank seeks to avail itself of protection under the FSIA, arguing that it is an agent or instrumentality of Romania. The Second Circuit has found that as a matter of law the Romanian Bank is entitled to protection under the FSIA, holding it to be an agent or instrumentality of the Romanian Government under the FSIA. *S & S Mach. Co. v. Masinexportimport*, 706 F.2d 411, 415 (2d Cir.), *cert. denied*, 464 U.S. 850, 104 S.Ct. 161, 78 L.Ed.2d 147 (1983). As "but a cat's paw of the Romanian government—an instrumentality owned and controlled by the state," the Romanian Bank is entitled to whatever protection under the FSIA that the Socialist Republic of Romania is itself entitled to claim as a foreign state.[6] 706 F.2d at 414.

■■■ The FSIA further provides that an otherwise immune entity will not be immune from attachment in aid of execution, or from execution upon a judgment where such immunity has been explicitly or implicitly waived by the sovereign state. 28 U.S.C. § 1610(b), (c). Romania explicitly waived its immunity from postjudgment attachment in the Agreement on Trade Relations between the United States of America and the Socialist Republic of Romania, which reads in pertinent part:

2. Nationals, firms, companies and economic organizations of either Party shall be afforded access to all courts and, when applicable, to administrative bodies as plaintiffs or defendants, or otherwise, in accordance with the laws in force in the territory of such other Party. They *shall not claim or enjoy immunities from suit or execution of judgment or* other liability in the territory of the other Party with respect to commercial or financial transactions, ... except as may be provided in other bilateral agreements.

Agreement on Trade Relations between the United States of America and the Socialist Republic of Romania, April 2, 1975, art. IV, 26 U.S.T. 2306, 2308, T.I.A.S. No. 8159 ("Treaty"). Therefore, the Romanian Bank cannot claim immunity from postjudgment attachment.

However, even where a sovereign has waived immunity from postjudgment attachment, the FSIA mandates that:

(c) No attachment or execution referred to in subsections (a) and (b) [attachments in aid of execution] of this section shall be permitted *until the court has ordered* such attachment and execution

28 U.S.C. § 1610(c) (emphasis added). The plain language of the Treaty makes clear that the government of Romania has indeed waived any immunity from postjudgment attachment that it might otherwise have enjoyed, but the Treaty in no way obviates any procedural protection to which Romania and its agents are entitled under the FSIA. In so holding I am in accord with Judge Stanton, who examined this issue in *Ferrostaal Metals Corp. v. S.S. Lash Pacifico*, and concluded that "when a foreign state has waived its immunity from postjudgment attachment, the Act requires that attachment can occur only by court order." 652 F.Supp. 420, 423 (S.D.N.Y.1987). No such order was obtained by G & H before it sought to restrain the assets of the Romanian Bank

**6.** G & H argues that the Romanian Bank lacks standing to invoke the protection afforded Romania as a sovereign state under the FSIA. As support, plaintiff cites *Republic of the Philippines v. Marcos*, 806 F.2d 344 (2d Cir.1986), *cert. denied*, ——— U.S. ———, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987), which held that certain individual defendants had no standing to raise the defense of sovereign immunity on behalf of the former president of the Philippines and his wife Imelda Marcos.

Plaintiff's reliance on *Marcos* is misplaced. In the instant case, the Romanian Bank does not seek to interpose the defenses available to Romania under the FSIA, but rather claims that it is itself entitled to certain protection by virtue of its status as an agent or instrumentality of the Romanian government. The Romanian Bank clearly has standing to invoke protection under the FSIA on its own behalf.

held in various New York commercial banks. This is in clear contravention of the FSIA. Therefore, the writ of execution and the restraining notices served by G & H on various New York banks restraining accounts maintained in those banks by the Romanian Bank are vacated.

Plaintiff law firm may seek a court order for attachment of the bank accounts maintained in New York by the Romanian Bank. However, a court order for postjudgment attachment can issue only after a finding by the court that "a reasonable period of time has elapsed following the entry of judgment...." 28 U.S.C. § 1610(c).[7] The House Report on the FSIA elucidates congressional thinking on the inclusion of this provision of the FSIA as well as factors that a court should consider in determining whether to issue such an order:

> In some jurisdictions in the United States, attachment and execution to satisfy a judgment may be had simply by applying to a clerk or to a local sheriff. This would not afford sufficient protection to a foreign state. This subsection contemplates that the courts will exercise their discretion in permitting execution. Prior to ordering attachment and execution, the court must determine that a reasonable period of time has elapsed following the entry of judgment, or in cases of a default judgment, since notice of the judgment was given to the foreign state under section 1608(e). In determining whether the period has been reasonable, the courts should take into account procedures, including legislation, that may be necessary for payment of a judgment by a foreign state, which may take several months; representations by the foreign state of steps being taken to satisfy the judgment; or any steps being taken to satisfy the judgment; or evidence that the foreign state is about to remove assets from the jurisdiction to frustrate satisfaction of the judgment.

H.R.Rep. No. 1487, 94th Cong., 2d Sess. 30, *reprinted in* 1976 U.S.Code Cong. & Admin.News 6604, 6629. I am satisfied that two months from the date of this Opinion would be a "reasonable period of time" as that phrase is used in the FSIA and explained in the legislative history.

Without entirely foreclosing the issue, I am presently inclined to the view that any postjudgment attachment plaintiff might get would extend to deposits maintained in New York City by the Romanian Bank, which is as the Second Circuit has found "but a cat's paw of the Romanian government." *S.S. Mach. Co.*, 706 F.2d at 414. The fact that the Romanian Bank is a mere agent or instrumentality of the Romanian government for purposes of claiming immunity and procedural protection under the FSIA would seem to subject the funds of the Romanian Bank to attachment to satisfy the debt of its principal—Romania.[8] I am further of the present view that were a restraining notice to issue as against accounts maintained by the Romanian Bank in New York City, such a notice could not effectively seek to restrain more than twice the amount due on the judgment, or twice $233,103.75. CPLR § 5222(b).

### Conclusion

Plaintiff G & H's application for an order directing the garnishee National Westminster Bank to transfer to plaintiff those sums of money in its possession or control held in the account of the Romanian Bank is denied.

Plaintiff G & H's application for an order directing the deposition of Minister Toader Rapanu is denied as moot.

The motion of the Romanian Bank for an order vacating the writ of execution and the restraining notices served by plaintiff upon various New York banks restraining accounts maintained there by the Romani-

---

**7.** § 1610(c) also requires "the giving of any notice required under section 1608(e)...." The prior proceedings with respect to the default judgment against Romania satisfy that condition.

**8.** Given the case law in this Circuit, the Romanian Bank's funds are *prima facie* subject to attachment in this case, and the Bank has the burden of showing otherwise.

an Bank is granted. An order may be settled on two (2) days notice.[9]

The foregoing is SO ORDERED.

9. Counsel for the Romanian Bank asserts a claim against plaintiff for damages in the amount of $30,000 arising out of these attachments. If the Bank wishes to press that claim, I will refer the matter to a magistrate for hearing, recommendation and report.