**S & S MACHINERY CO., Plaintiff,**

**v.**

**MASINEXPORTIMPORT, Defendant.**

Nos. 82 Civ. 4890 (WK),
83 Civ. 4383 (WK).

United States District Court,
S.D. New York.

Oct. 8, 1992.

Alfred R. Fabricant, Fabricant, Yeskoo & Colangelo, New York City, for plaintiff.

Masinexportimport, not represented by counsel.

## OPINION AND ORDER

WHITMAN KNAPP, SENIOR District Judge.

This lawsuit is by S & S Machinery ("plaintiff") against Masinexportimport ("defendant"), a machine tool trading company wholly owned and controlled by the Romanian government, to recover damages resulting from the purchase of defective equipment. Plaintiff was successful at trial and on July 10, 1991 we entered judg-

ment in its favor against defendant in the amount of $1,573,153.20 plus $24,613.29 in costs. Having assiduously but fruitlessly attempted to discover assets in defendant's name upon which it could execute that judgment, plaintiff now seeks an order pursuant to Fed.R.Civ.Pro. 69 and § 1610(a) of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.* ("FSIA"), piercing the "corporate veil" between defendant and the government of Romania and authorizing an order of attachment on its assets, specifically, its Consulate building. For the reasons that follow, plaintiff's motion is denied.

■ It is clear beyond peradventure that defendant is an "agency or intrumentality" of Romania. We specifically so held in our December 7, 1982 Memorandum and Order,[1] and the Court of Appeals affirmed our decision. *S & S Machinery v. Masinexportimport* (2d Cir.1983) 706 F.2d 411.[2] Defendant's status as a Romanian agent or instrumentality is, it follows, the law of the case, and the Supreme Court's standard for piercing the corporate veil is thereby satisfied. *See First National City Bank v. Banco Para El Comerico Exterior de Cuba* (1983) 462 U.S. 611, 629, 103 S.Ct. 2591, 2601, 77 L.Ed.2d 46 ("where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created, we have held that one may be held liable for the actions of the other"). Romania having waived immunity

from postjudgment attachment,[3] plaintiff should be granted its desired order of attachment directly against the assets of the government of Romania and its instrumentalities unless some other immunity in the FSIA or other applicable statute or treaty precludes it.

■ We conclude that we are barred from issuing the order plaintiff seeks, for two reasons. First, we hold that the Consulate building is immune from attachment under the Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227, Apr. 18, 1961, T.I.A.S. No. 7502. *See, e.g., Liberian Eastern Timber v. Government of the Republic of Liberia* (D.D.C.1987) 659 F.Supp. 606 (bank accounts of Liberian Embassy are immunized by Vienna Convention, Article 25). It is plain from plaintiff's motion that the main—and indeed only stated—target of its attachment is the Romanian Consulate building. However, Article 22(3) of that Convention states that "[t]he premises of the mission ... shall be immune from ... attachment or execution." Thus if that building is part of the "premises of the mission," it is immune from attachment.

The Court of Appeals has determined that the term "mission" in the Vienna Convention on Diplomatic Relations describes "a group of people sent by one state to another; it does not refer to the premises which they occupy." *United States v. Kos-*

---

**1.** We then granted, *inter alia,* defendant's motion to vacate plaintiff's prejudgment attachment of letters of credit it had opened on behalf of defendant. Having found defendant to be an agent or instrumentality of Romania within the meaning of § 1603(b) of the FSIA (in part on the basis of the affidavit of then-Romanian Consul Nicolae Sava, who stated that defendant "is a state foreign trade company wholly-owned and controlled by the Romanian Government"), we determined that §§ 1609 and 1610(d) immunized its property from such a *pre*judgment attachment unless Romania had explicitly waived its immunity. We did not find it so to have done. With respect to the *post*judgment attachment plaintiff now seeks, however, Romania has explicitly waived its immunity and that of its agents or instrumentalities. *See Agreement of Trade Relations between the United States of America and the Socialist Republic of Romania,* April 2, 1975, art. IV, ¶ 2, 26 U.S.T. 2306, 2308, T.I.A.S. No. 8159 ("Nationals, firms,

companies and economic organizations of either Party.... shall not claim or enjoy immunities from suit or execution of judgment"); *Agreement of Trade Relations between the Government of the United States of America and the Government of Romania,* art. XI, Pl.Aff.Exh.F. (same) (awaiting congressional approval).

**2.** We note that Judge Haight subsequently reached the same conclusion regarding the Romanian Bank for Foreign Trade's status as an "agent or instrumentality" in connection with a postjudgment attachment against the bank. Following the Second Circuit opinion in this case, he held the bank an agent or instrumentality of Romania, and found an explicit waiver of immunity in the U.S.–Romania Trade Agreement. *See Gadsby & Hannah v. Socialist Republic of Romania* (S.D.N.Y.1988) 698 F.Supp. 483.

**3.** *See supra,* note 1.

*tadinov* (2d Cir.1984) 734 F.2d 905, 908. In this connection, the court explained that the offices mentioned in Article 12 [4] "were to be physically inviolable to the same extent as the mission's primary premises"—that is, the embassy building—even if the persons working in such offices might not enjoy the same immunity. *Id.* at 909. It seems to us that the Consulate building is itself (or houses) exactly such offices, and must therefore be accorded the same immunity to which the mission's primary premises is entitled.[5]

■ Turning to our second ground, we conclude that the prayed-for order of execution and attachment cannot issue because the Consulate building does not fall within the exception from immunity requirements of § 1610(a). As an initial matter, it seems to us that § 1610(a)(4)(B) is conclusive on that question:

> (a) The property in the United States of a foreign state ... used for a commercial activity in the United States, shall not be immune from attachment in aid of execution ... if—
>
> (4) the execution relates to a judgment establishing rights in property—
>
> .     .     .     .     .
>
> (B) which is immovable and situated in the United States: *Provided,* That such property is not used for purposes of maintaining a diplomatic or consular mission.

Even if we were to assume that the judgment was or could be construed as "establishing rights in property," it is clear that the Consulate building property is "used for purposes of maintaining a ... consular mission." Moreover, the legislative history of the FSIA states clearly that § 1610(a)(4)(B)'s specific exemption of consular missions "applies to all of the situations encompassed by sections 1610(a) and (b)." 1976 U.S. Code Cong. & Admin. News 6604, 6628.

Nor do we believe that the Consulate building satisfies the commercial activity requirement of § 1610(a)—"property ... used for a commercial activity ... shall not be immune from attachment"—and thus is not excepted from immunity by that section. "Commercial activity" is defined in § 1603(d) as:

> either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or a particular transaction or act, rather than by reference to its purpose.

While the Court of Appeals in *Texas Trading v. Federal Republic of Nigeria* (2d Cir.1981) 647 F.2d 300, 308, opined that "[u]nfortunately, the definition of 'commercial' is the one issue on which the [FSIA]

---

**4.** "The sending State may not, without the prior express consent of the receiving State, establish offices forming part of the mission in localities other than those in which the mission itself is established."

**5.** We are aware, of course, that Article 31 of the Vienna Convention on Consular Relations, 21 U.S.T. 77, Apr. 24, 1963, T.I.A.S. No. 6820, does not grant consular premises the same explicit immunity from attachment that is extended to mission premises. Although we consider that the above reasoning obviates this concern, we also believe that Article 31 affords consular premises protection sufficient to immunize the Consulate building.

The Article states in relevant part that:
1. Consular premises shall be inviolable to the extent provided in this Article.
2. The authorities of the receiving State shall not enter that part of the consular premises which is used exclusively for the purposes of the work of the consular post except with

the consent of the head of the consular post ...

3. Subject to the provisions of paragraph 2 of this Article, the receiving state is under a special duty to take all appropriate steps to protect the consular premises against any intrusion or damage and to prevent any disturbance of the peace of the consular post or impairment of its dignity.

Plaintiff, it need hardly be said, cannot attach and dispose of only those portions of the Consulate building that are not "used exclusively for the work of the consular post." Similarly obvious is our inference—despite the silence of the record on this matter—that the Romanian Consul would refuse to consent to an entrance onto those rooms of the Consulate building given over to the work of the consular post to facilitate their being seized and sold. Nor would issuing an order of attachment be in any way conducive to the United States' duty to protect "consular premises against any intrusion" or "impairment of its dignity."

provides almost no guidance at all," [6] we do not believe that resolution of that question on the instant facts presents much difficulty.

In the first place, the legislative history of the FSIA states that "embassies and related buildings could not be deemed to be property used for a 'commercial' activity as required by section 1610(a)." 1976 U.S.Code Cong. & Admin. News 6604, 6628. It does not strike us as misguided to consider the Consulate building "related" to an embassy.[7] Moreover, even assuming for present purposes that the building might have housed an economic or commercial office, it is abundantly clear to us that the Consulate is primarily used for consular and other protected purposes. Such activities, it need hardly be said, are not those "in which a private person could engage," nor consular acts "so-called private acts subject to suit"; rather, it is axiomatic that only a sovereign can operate a Consulate and undertake the activities for which such a building is used. Applying a "restrictive theory of sovereign immunity," we conclude that the Consulate building is not "used for a commercial activity" and therefore does not fall within the immunity exception of § 1610(a).

Accordingly, plaintiff's motion is denied, without prejudice, however, to a renewal with proof that the Consulate building is no longer "premises of the mission," or the making of another motion seeking to attach assets of the government of Romania that are not afforded diplomatic immunity.

SO ORDERED.

---

**6.** The Court in that case set forth three "sources" to aid in determining whether behavior is commercial: the legislative history, which the court "put" as saying that "if the activity is one in which a private person could engage, it is not entitled to immunity" (*Id.* at 309); the existing case law at the time of the FSIA's enactment, which was described as following "[t]he restrictive theory of sovereign immunity ... [that] limits immunity to public acts, leaving so-called private acts subject to suit" (*id.,* quoting *Hearings on H.R. 3493 before Subcommittee on Claims and Governmental Relations of the House Committee on the Judiciary,* 93d Cong.,

1st Sess. 16 (1973) (Testimony of Charles N. Brower, Legal Adviser, Dep't of State)); and the then-current legal standard for international law, which "there can be little doubt follow[ed] the restrictive theory of sovereign immunity (*Texas Trading,* 647 F.2d at 310)."

**7.** *See, e.g., Gerritsen v. Escobar y Cordova* (C.D.Cal.1988) 688 F.Supp. 556, 559 ("legislative history of FSIA states that *consular* and diplomatic buildings are those of foreign state itself") (emphasis in original).