**COASTAL CARGO COMPANY, INC.**

v.

**M/V GUSTAV SULE, etc.**

Civil Action No. 96–1029.

United States District Court,
E.D. Louisiana.

Oct. 16, 1996.

John Christopher Person, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, LA, for Coastal Cargo Company, Inc.

Christopher Ogilvie Davis, Stacy Singleton, Phelps Dunbar, L.L.P., New Orleans, LA, for Estonian Shipping Company, Ltd.

## ORDER AND REASONS

DUVAL, District Judge.

Defendant, Estonian Shipping Company, Ltd. ("Estonian") on behalf of the M/V GUSTAV SULE ("GUSTAV SULE") filed a Motion for Release of Security and for Damages Incurred. Having reviewed the pleadings, memoranda, exhibits and the relevant law, the Court finds that the security must be released as required under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602, *et seq.* However, considering the circumstances surrounding the seizure, the Court finds that Estonian is not entitled to damages or expenses incurred in bringing its motion.

## BACKGROUND

Defendant, Estonian, a corporation organized under the laws of Estonia, is 100% owned by the Estonian government. Estonian in turn owns the Kegan Shipping Company ("Kegan"). Kegan, a Cypriot corporation, is the registered owner of the vessel GUSTAV SULE. Kegan bareboat chartered the vessel to Estonian under a three year demise charter beginning on April 5, 1994. Estonian subsequently time chartered the vessel in question to BAFF Shipping Company ("BAFF"). BAFF apparently carried cargo for American International Oil Corporation ("AIOC"). Coastal allegedly performed stevedoring services for AIOC relative to AIOC's cargo aboard the GUSTAV SULE in March of 1996. AIOC failed to pay a $45,000 stevedoring fee.

Coastal contends that prior to filing suit based on the maritime lien for AIOC's failure to pay, it attempted to obtain security in order to avoid the necessity of arresting the vessel. To that end, counsel for Coastal contacted the vessel's local agent, Tricon Steamship Agency, Inc. ("Tricon"). Tricon referred Coastal to the GUSTAV SULE's owner. Coastal checked Lloyds' Registry of Ships to verify ownership. Lloyds listed Kegan as record owner without an address or phone number for Kegan. Coastal then contacted Lloyds Maritime Information Services, Inc. which listed Kegan's address as "c/o Estonian Shipping Co." This information was apparently obtained on March 20, 1996, and was the first time that "plaintiff became aware of any reference to Estonian and, based on Kegan's 'c/o address,' it was assumed that Estonian was Kegan's managing agent." (Memorandum in Opposition at 2).

Coastal contacted Estonian by phone, but language barriers made telephonic communication impossible. Coastal's counsel then

faxed both "Kegan c/o Estonian" and Kegan's local agent Tricon informing them of the anticipated arrest.

In a return fax massage, dated March 21, 1996, (Plaintiff's Exhibit "D"), Estonian replied that it was:

> greatly perturbed by the news, however would like to explain that my (sic) Gustav Sule is presently under longterm charter employment to Messrs BAFF Shipping Ltd. Riga, . . . LATVIA.
>
> You will undoubtedly comprehend that it's rather the charterers who should be contacted on this issue—and we have immediately relayed Your (sic) message to them by fax.
>
> Taking into account all the circumstances we, as the vessel's Owners, do not feel ourselves in position to consider providing the security requested.

Neither was mention made of the Estonian government's relationship to the vessel nor did Estonian raise the possibility of its sovereign immunity in this fax. This fax also apparently provided the first notice to the plaintiff of the involvement of BAFF, but ostensibly because of time constraints, that lead was apparently not pursued by Coastal's counsel.

Coastal filed an *in rem* complaint against the GUSTAV SULE, and the vessel was arrested to enforce the maritime lien on March 21, 1996. Plaintiff contends that thereafter BAFF and BAFF's P & I Club, Steamship Mutual Underwriting Association (Bermuda), Ltd. ("Steamship Mutual") were "reluctant" to post security for the release of the vessel. Another counsel who represented himself as counsel for Estonian contacted plaintiff about the delay in the posting of security. Apparently, however, some arrangement was reached between counsel for Estonian and counsel for BAFF, because it is counsel that initially represented BAFF's underwriter in correspondence who has made an appearance on behalf of Estonian and has filed the instant motion.

As a result of these delays, the GUSTAV SULE was under arrest for several days allegedly causing delay and financial loss. Steamship Mutual eventually agreed to execute a letter of undertaking, reserving all rights that Estonian might have. (Defendant's Exhibit "D"). The vessel was released on March 23, 1996.

### ESTONIAN MAY INVOKE THE PROTECTION OF THE FOREIGN SOVEREIGN IMMUNITIES ACT

■ Estonian appears under Supplemental Admiralty and Maritime Rule E(8) to bring the instant motion requesting release of the security posted by Steamship Mutual for the release of the GUSTAV SULE. Estonian contends that the GUSTAV SULE was immune from seizure under section 1609 of the FSIA which provides "the property in the United States of a **foreign state** shall be immune from attachment, arrest and execution. . . ." Thus, Estonian must first establish that it meets the definition of "foreign state" in order to invoke the protection of section 1609.

Section 1603(a) of the FSIA defines in relevant part a "foreign state" as "an agency or instrumentality of a foreign state as defined in subsection (b)." Subsection (b) then provides:

> (b) An "agency or instrumentality of a foreign state" means any entity—
>
> (1) which is a separate legal person, corporate or otherwise, and
>
> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state of political subdivision thereof, and
>
> (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603. As it is undisputed that Estonian is wholly owned by the Estonian government, it constitutes a "foreign state" for the purposes of § 1609.

■ The analysis is complicated by the fact that Estonian does not "own" the M/V GUSTAV SULE. Kegan, which does own the vessel, is wholly owned by Estonian. However, Kegan is a corporation created under the laws of a third country—that being

Cyprus. Thus, Kegan is not protected under the FSIA. 28 U.S.C. § 1603(b)(3); *Borgships Inc. v. M/V MACARENA,* 1993 WL 278453, *2 (E.D.La. July 15, 1993).

■ Estonian, however, is the bareboat or demise charterer of the vessel.[1] The legal effect of that type of "ownership" has been analyzed in the *Borgships* decision cited above in which analysis this Court concurs. As stated therein:

> The demise or bareboat charter is, typically, a long-term agreement 'vesting in one person most of the incidents of ownership in a capital asset of that business—the ship—while another retains the general ownership and the right of reversion.' Grant Gilmore & Charles Black, Jr., *The Law of Admiralty* 239 (2d ed. 1975). In contrast to the time and voyage charters, in a demise charter the owner of the vessel relinquishes control and possession of the vessel to another. As a result of the unique nature of the demise, the charterer is considered to be the owner *pro hac vice.* Gilmore & Black, *supra,* at 242; see *Guzman v. Pichirilo,* 369 U.S. 698, 699 [82 S.Ct. 1095, 1096, 8 L.Ed.2d 205] (1962) (stating that the demise is tantamount to though just short of, an "outright transfer of ownership"). With regard to third parties, the vessel is considered to be the charterer's. Gilmore & Black, *supra,* at 242.

*Borgships,* 1993 WL 278453, *3; *see Walker v. Braus,* 995 F.2d 77, 80–81 (5th Cir.1993); *Agrico Chem. Co. v. M/V Ben Martin,* 664 F.2d 85, 91 (5th Cir.1981) (Rubin, J.).

■ Thus, Estonian, as the owner *pro hac vice* of the GUSTAV SULE, would insulate the ship under section 1609 because of its status as an agency of a foreign state. The only other issue with respect to the status sought by Estonian arises from the fact that the GUSTAV SULE was time chartered to BAFF. However, the analysis cited above supports the proposition that a time charter would not strip Estonian's rights under the FSIA as the requisite control does not pass pursuant to a time charter as opposed to a bareboat charter. As outlined in the *Walker* case cited above:

> In a time charter the vessel owner [here owner *pro hac vice* ] retains possession and control of the vessel; provides whatever crew is needed and is responsible for normal operating expenses. Further, in a time charter the owner fully equips and maintains the vessel, makes repairs as needed.

*Walker,* 995 F.2d at 81. Thus, the fact that there is such a charter has no effect on the FSIA analysis.

■ Nonetheless, Coastal maintains that section 1605(b) allows for the seizure of the vessel at issue. Under 28 U.S.C. § 1605(b), a foreign state:

> shall not be immune from the jurisdiction of the courts of the United States in any case in which a suit in admiralty is brought to enforce a maritime lien against a vessel ... of the foreign state, which lien is based upon commercial activity of the foreign state....

*Id.* This section denies immunity to a foreign state that is subject to a maritime lien; it does not, however, allow the arrest of the vessel in contravention of section 1609 of FSIA. *Mangattu v. M/V IBN HAYYAN,* 35 F.3d 205, 209 (5th Cir.1994).

Coastal relies on *Crane Vessel Titan 5 v. Haik,* 1996 AMC 1461, 70 F.3d 1269 (5th Cir.1995), *cert denied,* —— U.S. ——, 116 S.Ct. 1705, 134 L.Ed.2d 803 (1996). In that case, the Fifth Circuit affirmed a district court's holding that section 1605(b) overrides the general provisions of 28 U.S.C. §§ 1609–1620 in the context of a request for mandamus. The Court is not persuaded that it is "controlling" precedent. To begin, FRAP 47.5.3 as Amended on Oct. 17, 1995, effective January 1, 1996 states:

> *47.5.3. Unpublished Opinions Issued Before January 1, 1996. Unpublished opinions issued before January 1, 1996 are precedent. However, because every opinion believed to have precedential value is published, such an unpublished opinion* ***should normally be cited only when the doctrine of res judicata, collateral estop-***

---

1. (See Defendant's Exhibit "C").

*pel or law of the case is applicable (or similarly to show double jeopardy, abuse of the writ, notice, sanctionable conduct, entitlement to attorney's fees, or the like)* . . . .

Thus, under the Fifth Circuit's own rules, while the case is considered precedent, "normally" the Court should only rely on such a case for the reasons enumerated, which are not present here.

Furthermore, the *Mangattu* case was decided in 1994 by another panel of the United States Court of Appeals for the Fifth Circuit. It directly addressed the interrelationship between sections 1605 and 1609, albeit in the context of attachment under Admiralty Rule B as opposed to an arrest under Admiralty Rule C. Nonetheless, the appellate court stated "The plain words of [section 1609] preclude reading the language of §§ 1605 and 1606 to control the issue in this case." *Mangattu,* 35 F.3d at 209. Thus, to the extent that the *Mangattu* court has spoken on the subject and that decision conflicts with the decision in *Crane Vessel Titan 5,* this Court must follow *Mangattu* as precedent. "The first of conflicting panel decisions is to be followed." *Paura v. United States Parole Commission,* 18 F.3d. 1188 (5th Cir.1994). "No rule is more firmly settled in our Circuit than that 'no panel . . . can overrule a decision previously made by another.'" *Johnson v. Moral,* 843 F.2d 846, 847 (5th Cir.1988), citing *Ryals v. Estelle,* 661 F.2d 904, 906 (5th Cir.1981).

Finally, the FSIA "essentially provides a statutory 'long-arm' procedure for obtaining *in personam* jurisdiction over foreign sovereigns, while eliminating *in rem* or *quasi in rem* jurisdiction based on the arrest or attachment of the property of a foreign state." C. Taylor Simpson, *The Restrictive Theory of Sovereign Immunity Under the Foreign Sovereign Immunities Act: The Perspective of a Maritime Lienholder,* 57 Tul. Mar. L.J. 37, 59 (1994). Once jurisdiction is obtained, the action proceeds in an *in rem* fashion. The legislative history suggests the purpose of the section was to "render unnecessary" the practice of seizing and attaching property to obtain jurisdiction. The use of *in rem* jurisdiction was exchanged for "long arm" procedures to obtain *in personam* jurisdic-

tion, which is the proper method of claiming a maritime lien over a foreign sovereign. *See Id.; see generally* A.N. Yiannopoulos, *Foreign Sovereign Immunity and the Arrest of State–Owned Ships: The Need for an Admiralty Foreign Sovereign Immunity Act,* 57 Tul.L.Rev. 1274, 1303 (1983).

> The purpose of this subsection is to permit a plaintiff to bring suit in a U.S. district court arising out of a maritime lien involving a vessel or cargo of a foreign sovereign without arresting the vessel, by instituting an in personam action against the foreign state . . . in view of section 1609 of the bill, section 1605(b) is designed to avoid arrests of the vessels or cargo of a foreign state. . . .

H.R.Rep. No. 1487, 94th Cong., 2d Sess. 21 (1976), *reprinted in* 1976 U.S.C.A.N. 6604, 6620. *See* 2 T. Schoenbaum, *Admiralty and Maritime Law,* § 20–3, 459 (1994).

As previously mentioned, in *Mangattu,* 35 F.3d at 209, the United States Court of Appeals for the Fifth Circuit interpreted the FSIA as denying an *in rem* action in cases where the arrest or attachment is made to obtain jurisdiction. The court stated that the section 1605 waiver of jurisdiction applies to jurisdictional immunity, while the issue of attachment is governed by section 1609 which provides that the property of a foreign state shall be immune from attachment, arrest and execution. *Id.* The plain language precludes a reading that section 1605 controls in this case. *Id.* The Fifth Circuit stated that under section 1610 attachment is allowed to secure a judgment that may ultimately be entered and is not for the purpose of jurisdiction. *Id.*

Based on the foregoing, Estonian's motion for the release of security must be granted.

### ESTONIAN DID NOT WAIVE SOVEREIGN IMMUNITY

■ One of the exceptions to sovereign immunity is "in any case . . . in which the foreign state has waived its immunity either expressly, or by implication." 28 U.S.C. § 1605(a)(1). Implicit waivers are ordinarily found in three situations: (1) a foreign state agrees to arbitration in another country; (2) the foreign state agrees that a contract is

governed by the laws of a particular country; or (3) the state files a responsive pleading without raising the immunity defense. *Rodriguez v. Transnave Inc.*, 8 F.3d 284, 287 (5th Cir.1993), *citing* H.REP. NO. 1487, 94th CONG.2d SESS. 18 *reprinted in*, 1976 U.S.C.C.A.N. 6604, 6617. The implicit waiver clause has been narrowly construed; courts rarely find that a nation has waived its sovereign immunity without strong evidence that this is what the foreign state intended. *Id.*

■ Coastal claims that Estonian waived its sovereign immunity under FSIA under the third prong because it posted security through a letter of undertaking without raising the sovereign immunity defense and did not in fact raise the defense until two weeks after the vessel was arrested. However, as required under the third prong, there is no responsive pleading filed in this matter that failed to raise the immunity defense. Rather, Estonian has filed a Claim to Vessel (Doc. 6) and the subject Motion for Release of Security, reserving its rights to immunity. Thus, there is no implicit waiver at work here.

Furthermore, Coastal's position is not supported by the facts. In Steamship Mutual's Letter of Undertaking of March 23, 1996, to Coastal Cargo, it states:

This letter is written without prejudice to any and all rights and defenses which the said M/V GUSTAV SULE and/or her owner may have, none of which is to be regarded as waived, including but not limited to the right to file a Complaint for, or otherwise plead exoneration from or limitation of liability, and is not to be construed in any sense as an admission of liability.

(Coastal's Exhibit "E"). It is thus apparent that there was never any intent to waive this sovereign immunity defense on the part of Estonian.

Coastal argues alternatively in its reply memorandum that no security was posted on behalf of Estonian, but rather on behalf of BAFF. Coastal claims that Steamship Mutual attempted to reserve all rights of the vessel and its owner although the rights were not Steamship Mutual's to reserve because it was without privity of contract or subrogation.

In *Borgships*, the underwriter for the record owner issued security to have the ship released. The letter of undertaking, like the letter in this case, reserved the rights of all owners. The court found this included those rights of the owner *pro hac vice*. The Court stated:

The sole reason for posting the letters of undertaking was to secure the vessel's release from improper prejudgment attachment. Accordingly, if the vessel must be released from attachment on the grounds of sovereign immunity, the security must also be released.

*Borgships Inc., Monrovia v. M/V Macarena*, 1993 WL 408342 at *3. (E.D.La. Oct. 4, 1993). This Court concurs in such an analysis.

### ESTONIAN IS NOT ENTITLED TO DAMAGES AND EXPENSES

■ Estonian contends that it is entitled to legal fees and expenses incurred in bringing the instant motion because "Coastal was made aware of the fact that Estonian was the ultimate and disponent owner of the GUSTAV SULE on April 19, 1996." [2] Thus, it claims it should be awarded damages for having been forced to bring this motion.

Under 28 U.S.C. § 1605(b)(1), the party bringing suit shall be "liable for any damages sustained by the foreign state as a result of the arrest if the party bringing suit had actual or constructive knowledge that the vessel . . . of a foreign state was involved." *Jet Line Services, Inc. v. M/V MARSA EL HARIGA*, 462 F.Supp. 1165, 1174 (D.Md. 1978). The legislative history of section 1605 states that "evidence that a party has relied on a standard registry of ships, which did not reveal a foreign state's interest in a vessel, would be prima facie evidence of the party's unawareness that a vessel of a foreign state was involved." H.R.Rep. No. 1487, 94th Cong., 2d Sess. 22, 1976, *reprinted in*, 1976 U.S.C.C.A.N. 6604, 6620–21.

**2.** This motion was filed on July 19, 1996.

Coastal's lack of actual or constructive knowledge concerning Estonian's status at the time of arrest is manifest as outlined in the facts above. Indeed, the Lloyd's Ship Registry listed Kegan Shipping Co. as the owner of the vessel. Had Estonian informed Coastal prior to the seizure of the GUSTAV SULE that it was the vessel's owner *pro hac vice,* which opportunity Coastal provided to Estonian, this entire matter might have been avoided. The shell game played by Estonian in March does not merit the awarding damages in favor of Estonian at this time.

Furthermore, the statute allows for "damages" arising out of the wrongful seizure. The Court has not found a case which defines such damages; however, in a maritime context, damages for wrongful seizure consist generally of the detention costs. *Marastro Compania Naviera S.A. v. Canadian Maritime Carriers, Ltd.,* 963 F.2d 754, 756 (5th Cir.1992); 2 T. Schoenbaum, *Admiralty and Maritime Law,* § 21–6 p. 500 (1994). As those damages arising from the detention of the vessel, if any, were caused by Estonian's failure to inform Coastal of its status, the Court cannot justify an award of such damages. Furthermore, the Court is unaware of any case which treats litigation costs such as those arising from the instant motion as "damages" for purposes of section 1605(b). Thus, because such damages are neither factually justified, nor legally justified, the Court denies Estonian's motion. Accordingly,

**IT IS ORDERED** that Estonian Shipping Company, Ltd.'s Motion for Release of Security and for Damages Incurred is **GRANTED** in part, in so far as defendant is ordered to release the security, that is the original Letter of Undertaking, and **DENIED** in part.