**ENRON EQUIPMENT
PROCUREMENT
COMPANY,**

v.

**THE M/V TITAN 2, Her Engines,
Tackle, Apparel, etc. In Rem
and Scansov Offshore AB.**

No. 99–1111.

United States District Court,
W.D. Louisiana.
Lake Charles Division.

Dec. 13, 1999.

604

James R. Nieset, Vernon E. McGuire, III, Plauche' Smith & Nieset, Lake Charles, LA, John H Barr, Jr., Bracewell & Patterson, Houston, TX, for Enron Equipment Procurement Co., plaintiff.

William M. Bass, W. Gerald Gaudet, Voorhies & Labbe, Lafayette, LA, for Scansov Offshore AB, defendant.

Susan S. Robinson, Laborde & Neuner, Lafayette, LA, Rebecca L. Robertson, Baker & Botts, Houston, TX, Bradford H. Felder, Jeansonne & Remondet, Lafayette, LA, for State Production Enterprise, Chernomorneftegaz.

### *MEMORANDUM RULING*

TRIMBLE, District Judge.

Presently before the court is a motion to dismiss the complaint, to dissolve the arrest and attachment of the TITAN 2, and for damages for unlawful seizure [doc. 17]. This motion was filed by defendant State Production Enterprise Chernomorneftegaz pursuant to Rules 12(b)(1) and 12(h)(3) of the Federal Rules of Civil Procedure. For the following reasons, this court finds that the motion to dissolve the arrest and attachment of the TITAN 2 and for damages for unlawful seizure should be DENIED.

### I. FACTUAL BACKGROUND

Since 1991, the Ukraine has been an independent sovereign nation which owns all shares of the joint stock company State Production Enterprise Chernomorneftegaz (hereinafter "Chernomorneftegaz"). Chernomorneftegaz controls the Ukraine's oil and gas exploration and production on the Crimean Peninsula and its offshore territory. Chernomorneftegaz also owns the Crane Vessel TITAN 2 which sails under the Ukrainian flag.

In 1998, Chernomorneftegaz engaged ScanSov Offshore AB (hereinafter "Scan-Sov") to act as Chernomorneftegaz's agent in arranging for necessary repairs to the TITAN 2. ScanSov then entered a separate maintenance agreement and repair agreement with plaintiff, Enron Equipment Procurement Company (hereinafter "Enron"), to render the vessel and crane operational.

In the maintenance agreement ScanSov acknowledged that Enron "is entitled to a statutory lien, under applicable Law against the Titan 2 to secure payment of money due under this Agreement." *See* Maintenance Agreement ¶ 5. The repair agreement acknowledged that Enron "is entitled to a lien against the Titan 2 to secure payment of money due under this Agreement, and [ScanSov] shall execute any further instrument as may be reasonably required by [Enron] to evidence the granting of this security lien." *See* Repair Agreement ¶ 5.

In negotiating both agreements, representatives of Enron, ScanSov, and Chernomorneftegaz all met numerous times to discuss the contracts. The Deputy Chairman of the Board of Chernomorneftegaz, Valeriy Gulev, attended approximately twenty-five of the approximately thirty

meetings. In these meetings Enron's representative, Robert MacMillan, insisted upon the lien detailed in ¶ 5 of both agreements because Enron wanted security for the cost of the repairs which totaled millions of dollars. Mr. MacMillan was advised that in the event that Enron was not paid for its work on the TITAN 2, the lien would provide security for the payment of the monies owed.

The work was completed by Enron. With some additional requested repairs Chernomorneftegaz then owed Enron more than $7,500,000. On June 23, 1999, Enron filed a complaint for the money owed and subsequently arrested and attached the TITAN 2. As of December 3, 1999, Chernomorneftegaz has paid part of the debt but still owes $159,770.45 under the maintenance agreement and $5,861,-394.00 under the repair agreement. Chernomorneftegaz now moves this court to determine that Chernomorneftegaz is a foreign state subject to the Foreign Sovereign Immunity Act of 1976, and therefore, that it is immune from pre-judgment arrest and attachment since it did not explicitly waive immunity as required under § 1610(d). Defendant Enron responds by insisting that prejudgment arrest and attachment is permitted under § 1605(b). In the alternative, even if only § 1610(d) allows prejudgment arrest and attachment, Chernomorneftegaz has explicitly waived its immunity for the attachment. Thus, the attachment is proper.

## II. LEGAL ANALYSIS

To qualify under the Foreign Sovereign Immunities Act[1], an entity must first prove that it is a foreign state or an arm of the foreign state under § 1603(a). If the entity qualifies, it is afforded the protections of sovereign immunity. There are numerous ways under § 1605(a) to waive the immunity in order for a court to obtain *in personam* jurisdiction. Courts have split as to whether *in rem* jurisdiction which allows for attachment and arrest of the sovereign's property is confined to

§ 1610–11 or if § 1605(b) may allow for attachment.

Under § 1605(b) the right to enforce a maritime lien is given if based upon a commercial activity of the foreign state. Under § 1610(d) both an explicit waiver by the sovereign and the purpose for securing the debt must be met to allow attachment.

In the case at bar, Chernomorneftegaz is a foreign state. However, as explained more fully in this ruling, the right to enforce a maritime lien under § 1605(b) does not permit the attachment of a vessel. Chernomorneftegaz has explicitly waived its immunity of attachment by its own actions and the actions and writings of its agent, ScanSov. Since Enron already has personal jurisdiction, the attachment is merely to provide security. Thus, the attachment under § 1610(d) is proper.

### A. Chernomorneftegaz is a Foreign State under § 1603(a).

■ To qualify for jurisdictional immunities an entity must be a "foreign state" or an agency or instrumentality of a foreign state. *See* 28 U.S.C. § 1603(a). An agency or instrumentality is defined as any entity

1) which is a separate legal person, corporate or otherwise, and

2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

*See* 28 U.S.C. § 1603(b).

Chernomorneftegaz is a foreign state because it meets the requirements addressed in § 1603(b). The Affidavit of Valeriy Gulev taken on October 7, 1999, illustrates that all requirements have been met. First, Chernomorneftegaz is a separate legal entity. Second, all shares are owned by the foreign state of the Ukraine. Third, Chernomorneftegaz is neither a citi-

1. *See* 28 U.S.C. § 1602 *et seq.*

zen of the United States, nor was it created under the laws of a third country. Thus, Chernomorneftegaz qualifies as a foreign state and 28 U.S.C. § 1602 *et seq.* is therefore applicable.[2]

## B. § 1605(b) Does Not Confer *In Rem* Jurisdiction.

It is clear from 28 U.S.C. § 1609 that all "foreign states shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter." Thus, unless jurisdiction for attachment is granted under either § 1610 or § 1611, one cannot attach a foreign state's property. *Mangattu v. M/V IBN HAYYAN*, 35 F.3d 205, 209 (5th Cir. 1994). The plain language permits attachment of a vessel *only* under § 1610 or § 1611. *Id.*

Although it is true that § 1605(b) provides jurisdiction for a maritime lien, the word "attachment" is not used in the section. Section 1605 if read in its entirety is actually discussing *in personam*, not *in rem*, jurisdiction. For example, § 1605(c) states:

> Whenever notice is delivered under subsection (b)(1), the suit to enforce a maritime lien shall thereafter proceed and shall be heard and determined according to the principles of law and rules of practice of suits in rem whenever it appears that, *had* the vessel been *privately* owned and possessed, a suit in rem might have been maintained.

(emphasis added). Hence, if the vessel was privately owned a suit *in rem* may have been proper, but not in the case of a foreign state.

The Fifth Circuit in *Mangattu* specifically held that § 1609 precludes "reading the language of §§ 1605 and 1606 to control ..." attachment. *Id.* at 209. *See also Coastal Cargo Co., Inc. v. M/V GUSTAV SULE*, 942 F.Supp. 1082, 1085 (E.D.La. 1996).[3] The court went on to find that since the qualifications under § 1610(d) were not met, the district court was correct in its determination to release the vessel. *Id.* at 209–10.

The legislative history behind the Foreign Sovereign Immunities Act supports the holding in *Mangattu*. The Departments of State and Justice would not agree to any type of pre-judgment arrest or attachment without the express waiver by the foreign sovereign. *See* William R. Dorsey, III, *Reflections on the Foreign Sovereign Immunities Act After Twenty Years*, 28 J.Mar.L. & Com. 257, 266 (1997). Furthermore, the proposed language tracked the Suits in Admiralty Act in the hope that § 1605(b) "would be treated as a 'substitute' in rem action in accordance with the intent of the original drafters of the FSIA." *Id.* at 280.

The court in *Coastal Cargo* held that *Mangattu* is controlling precedent in the Fifth Circuit. Despite *Crane Vessel Titan 5 v. Haik*, 70 F.3d 1269 (unpublished 5th Cir.1995) and *S.H.R.M. Catering v. TITAN 2*, (unpublished S.D.Tex.1996) both being decided after *Mangattu* and holding that § 1605(b) does allow attachment of a vessel, this court is bound to follow the controlling precedent set by the court in *Mangattu*.[4]

**2.** Originally, Chernomorneftegaz offered an affidavit made in 1994 to prove these elements. Enron objected to use of the older affidavit due to potentially out of date information. Since Chernomorneftegaz provided an affidavit dated October 7, 1999, and because no other objections are forthcoming, the court accepts the new affidavit as proof of the requirements for foreign state status.

**3.** Plaintiff has argued that *Mangattu* only applies to § 1605(a) not § 1605(b). However, the plain language of *Mangattu* states specifically § 1605 is precluded and does not differ-

entiate between (a) and (b). Additionally, the court sees no reason to apply *Mangattu* to only part of a section when the court's reasoning in *Mangattu* for precluding the section under § 1609 is still valid.

**4.** First, as to *Haik*, the decision was rendered after *Mangattu*. If there are conflicting panel decisions, the first is to be followed. *Paura v. United States Parole Commission*, 18 F.3d 1188 (5th Cir.1994); *See also Coastal Cargo*, 942 F.Supp. at 1086. Also under F.R.A.P. 47.5.3 unpublished opinions prior to January 1, 1996 are precedent, but those opinions

Furthermore, the court agrees that § 1605(b) allows plaintiffs to proceed *in personam* against foreign state's vessels for which an *in rem* action may not be maintained due to § 1609. The intent of Congress under § 1609 prevents § 1605(b) to allow attachment of a vessel. *See also Mangattu*, 35 F.3d at 209. Thus, under the plain language the TITAN 2 cannot be arrested or attached under § 1605(b).

### C. The Arrest and Attachment is proper under § 1610(d).

Prior to an entry of judgment, property of a foreign state used for commercial activity is not immune from attachment if:

(1) the foreign state has explicitly waived its immunity from attachment prior to judgment, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, and

(2) the purpose of the attachment is to secure satisfaction of a judgment that has been or may ultimately be entered against the foreign state, and not to obtain jurisdiction.

28 U.S.C. § 1610(d). Both (1) and (2) must be met to allow attachment. For (1) an explicit, not an implicit waiver, is mandated.

Contrary to plaintiff's declarations, agreeing to arbitration and consenting to be governed by laws in a certain country are not explicit waivers. Rather these are implicit waivers. *See* H.REP. NO. 1487, 94th CONG.2d SESS. 18 *reprinted in*, 1976 U.S.C.C.A.N. 6604, 6617 (stating that implicit waivers ordinarily include three situations: the foreign state agrees to arbitration in another country; the foreign state agrees that a contract is governed by the laws of a particular country; or the state files a responsive pleading without raising the immunity defense.)

However, in the case at bar, there is an explicit waiver. For an explicit waiver, ScanSov must have both had the authority to grant a lien under § 1610 and must have explicitly granted the attachment; or Chernomorneftegaz, itself, must have granted the explicit waiver. Moreover, attachment is only appropriate to secure satisfaction of a debt, not to obtain jurisdiction. The court finds that an express waiver was granted both by ScanSov who had permission to grant the waiver and by Chernomorneftegaz. The court also finds that the purpose was not to obtain jurisdiction, but rather to secure satisfaction of any future judgment.

### 1. ScanSov had the Express Authority to Grant the Lien.

Under Texas law the scope of the agent's authority may be governed in three ways: express, implied, or apparent. *See Toonen v. United Services Auto. Ass'n*, 935 S.W.2d 937, 941 (Tex.App.—Houston [14th Dist.] 1996, no writ). Express authority occurs when the principal makes it clear that the act under scrutiny is to be done. *See Pasant v. Jackson Nat'l Life Ins.*, 52 F.3d 94, 97 (5th Cir.1995) (*citing City of San Antonio v. Aguilar*, 670 S.W.2d 681, 683–84 (Tex.App.–San Antonio 1984, writ dism'd)). For implied authority there must be at least circumstantial proof of actual authority. *Id.*

On the other hand, apparent authority "is created as to a third person by conduct that would lead a reasonably prudent person to believe that the principal consents to the act done on his or her behalf by the alleged agent." *See Nati-*

---

should normally only be cited when res judicata, collateral estoppel, or law of the case is applicable. *See Coastal Cargo*, 942 F.Supp. at 1086.

Second, as to *S.H.R.M. Catering*, the decision was published after January 1, 1996. Under F.R.A.P. 47.5.4 unpublished opinions issued on or after January 1, 1996 are not precedent except under the doctrine of res judicata, collateral estoppel or law of the case. *See also Conoco Inc. v. Dir. Office of Worker's Comp. Programs*, 194 F.3d 684, at FNT. 2 (5th Cir.1999). Furthermore, a district court may never set precedent over a controlling court of appeal's decision.

*onsBank v. Dilling,* 922 S.W.2d 950, 953 (Tex.1996). An agent acting within the scope of his apparent authority binds the principal as though the principal had performed the action. *Grace Community Church v. Gonzales,* 853 S.W.2d 678, 680 (Tex.App.—Houston [14th Dist.] 1993, no writ) (citing *Ames v. Great Southern Bank,* 672 S.W.2d 447, 450 (Tex.1984)).

ScanSov had explicit power to allow the pre-judgment attachment. In the meetings with the representatives of Enron, none of Chernomorneftegaz's representatives denied or even questioned ScanSov having the authority to grant the liens and security interests. In fact, Mr. Asmus, an attorney present[5], advised that in the event Enron was not paid for its work, the lien on the vessel would provide security for the payment of the monies owed Enron. This court finds that Chernomorneftegaz's failure to deny ScanSov's authority and Chernomorneftegaz's actual consent to the lien and security interest is sufficient to expressly grant ScanSov authority to acquiesce to attachment and arrest.

 The representations made to Enron were not only explicit, but also implicit and apparent in condoning the actions and authority of ScanSov to grant the liens. It was explicit because ScanSov, according to Chernomorneftegaz, had authority to grant the lien and security interest. It was implicit because the authority granted to ScanSov was the authority necessary to negotiate the repairs of the TITAN 2. Mr. MacMillan's affidavit makes it clear that without the granting of the security interest neither the repair agreement nor the maintenance agreement would have been entered. It is apparent because ScanSov (with Chernomorneftegaz's representatives being present) represented itself as capable of granting the liens and security interest. A reasonably prudent

person would certainly believe that Chernomorneftegaz consented to the act. Thus, Chernomorneftegaz is liable for the representations made by its agent on its behalf.

Chernomorneftegaz does not contend that ScanSov exceeded its authority by granting a lien or security interest to Enron. *See* Claimant's Supplemental Brief on Agency Issues. Despite this contention, Chernomorneftegaz argues that only the *sovereign's* clear expression of waiver will suffice under § 1610.[6] Interestingly, Chernomorneftegaz representatives agreed that ScanSov had the authority to grant the liens and the security interest but never mentioned that it precluded arrest or attachment. Moreover, the granting of the lien and security interest was the equivalent to granting permission for the attachment. *See* Section 2. It does not make sense to contend ScanSov may grant a lien *but not* a lien under § 1610(d).

For the foregoing reasons, ScanSov acting as Chernomorneftegaz's agent had the authority to grant a lien and security interest for attachment and arrest of the TITAN 2.

## 2. ScanSov Effectively Granted *In Rem* Jurisdiction and Waived Immunity under § 1610(d).

 A foreign sovereign may waive immunity by using a phrase such as it has "irrevocably and unconditionally waive[d] any right or immunity from legal proceedings including suit judgment and execution on grounds of sovereignty which it or its property may now or hereafter enjoy." *See Libra Bank Limited v. Banco Nacional De Costa Rica, S.A.,* 676 F.2d 47, 49 (2nd Cir.1982). Foreign sovereigns may also waive immunity by specifically waiving rights under the Foreign Sovereign

---

5. Although it is unclear whether Mr. Asmus represented ScanSov or Chernomorneftegaz, it is clear that Mr. Asmus did not represent Enron.

6. This court does find that Chernomorneftegaz did clearly express a waiver by the actions and representations in the meetings by Chernomorneftegaz's Deputy Chairman. However, even if the foreign state had not expressed this waiver, the actions of ScanSov still effectively consented to the attachment.

Immunities Act of 1976 or specifically waiving prejudgment seizure, arrest, or attachment. *See Triton Container Int'l Ltd. v. M/S ITAITE* and *Triton Container Int'l Ltd. v. M/S Itapage,* 774 F.Supp. at 1351; *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.,* 875 F.2d 1174, 1177 (5th Cir.1989).

The other extreme is when general vague language clearly does not explicitly waive immunity. Language such as:

> It is agreed that in the event of the failure of the reinsurers hereon to pay any amount claimed to be due hereunder the Reinsurers hereon, at the request of Elkhorn will submit to the jurisdiction of any Court of competent jurisdiction within the United States and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court.

*Moore v. National Distillers & Chem. Corp.,* 143 F.R.D. 526, 535 (S.D.N.Y.1992). While this statement clearly grants jurisdiction, it does not secure a lien by attachment or arrest. Courts have also held that waiver of "other immunity" from liability was not an explicit waiver of immunity. *See Security Pacific Nat'l Bank v. Iran,* 513 F.Supp. 864, 879–80 (C.D.Cal. 1981).

 However, an explicit waiver need not be exactly as the waiver in *Libra Bank Limited.* Although the waiver must consent to pre-judgment attachment or arrest, those specific words are not required. *See Moore,* 143 F.R.D. at 536. The court in *Moore* stated that a waiver need not specifically state the words "prejudgment attachment." *Id.* The court instead reasoned that "a waiver of immunity must be explicit in the common sense meaning of that term." 143 F.R.D. at 536 *citing S & S Machinery Co. v. Masinexportimport,* 706 F.2d 411, 416 (2nd Cir.1983). The court went on to require a clear statement, not an implicit waiver. *Id.*

In the case at bar each contract contains different language. The repair agreement grants "a lien against the Titan 2 *to secure payment of money* due under this Agreement and shall execute any further instrument as may be reasonably required by Contractor to evidence the granting of this *security interest.*" Repair Agreement ¶ 5 (*emphasis added*). The maintenance agreement states that Enron "is entitled to a statutory lien, under applicable Law, against the Titan 2 *to secure payment of money* due under this Agreement." Maintenance Agreement ¶ 5 (*emphasis added*).

The language used in these agreements cannot be interpreted as granting anything other than consent to a pre-judgment arrest and attachment. Although Chernomorneftegaz explains that the consent given was merely to a § 1605(b) *in personam* jurisdiction, it is clear that this lien was to secure money, not jurisdiction.[7] It is true that § 1605(b) uses the word "lien," but the other words in the Enron contract requires the lien to secure payment and grants a security interest.

A security interest is defined as:

> The term "security interest" means any interest in property acquired by contract for the purpose of securing payment or performance of an obligation or indemnifying against loss or liability. A security interest exists at any time, (A) if, at such time, the property is in existence and the interest has become protected under local law against subsequent judgment lien arising out of an unsecured obligation, and (B) to the extent that, at such time, the holder has parted with money or money's worth. I.R.C. § 6323(h).

Black's Law Dictionary 1357 (6th ed.1990). The court can think of no other meaning for the contracts' statements other than consenting to arrest or attachment. If only the word "lien" had been used, this court could foresee the possible interpretation of merely a maritime lien under

---

**7.** Both agreements specifically state that the lien is "to secure payment of money."

§ 1605(b) which would deny the right to arrest and attachment. However, using the court's analysis in *Moore,* the common sense meaning can only permit attachment. A security interest includes the right to attach the property to secure payment of the prejudgment debt.

This reading is in conformity with § 1610(d)(2). This section states that the purpose of the attachment "is to secure satisfaction of a judgment." *See* § 1610(d)(2). Despite Chernomorneftegaz's statement that "[t]here is not one word in the lien provision to indicate that ScanSov or Chernomorneftegaz intended that the lien be enforced against the vessel *in rem*," the phrases "to secure payment of money," "granting of this security interest," and the granting of a lien indicate an intent to allow for attachment and arrest to secure payment.[8] Due to the debt still owed to Enron, the desire for a pre-judgment attachment clause has been validated. Thus, for the foregoing reasons Scan-Sov has effectively consented to the arrest and attachment of the TITAN 2 for Chernomorneftegaz.

3. **Alternatively, Chernomorneftegaz Effectively Granted *In Rem* Jurisdiction and Waived Immunity under § 1610(d).**

 Even if ScanSov did not effectively waive immunity under § 1610(d), the court finds that Chernomorneftegaz effectively did. Section 1610(d) mandates only that the waiver be express, not necessarily in writing. Chernomorneftegaz's Deputy Chairman's [9] attendance, participation, and representations at the meetings with Enron's representative, Mr. MacMillan, demonstrate consent to the lien against TITAN 2 to secure payment of money due. Additionally, the statements made by Mr. Asmus informing Mr. MacMillan that the lien would . provide security in the event Enron was not paid is explicit enough.[10] It is clear that in order to enter into the contract Chernomorneftegaz's representatives allowed and represented that payment of the millions of dollars owed would be *secured* by the vessel. The representatives did not state that the vessel would provide only a way to obtain jurisdiction. Thus, it is clear that regardless of Scan-Sov's authority, Chernomorneftegaz has waived jurisdiction.[11]

Thus, for the foregoing reasons, Chernomorneftegaz has effectively consented to the pre-judgment attachment and arrest.

4. **The Purpose of Enron's Attachment was to Secure Satisfaction of the Debt, not to Obtain Jurisdiction.**

 A foreign state is not immune from jurisdiction of the United States if any one of the requirements under § 1605(a) are met. This includes the foreign state explicitly or implicitly waiving its immunity. *See* 28 U.S.C. § 1605(a)(1). A foreign state may waive its immunity implicitly by agreeing to arbitrate in another country, agreeing to a contract being governed by the laws of a particular country; or the foreign state filing a responsive pleading without raising the immunity defense. *See Coastal Cargo Co. Inc. v. M/V*

---

8. Chernomorneftegaz incorrectly implies that a maritime lien enforced *in personam* against the vessel owner would render the same "security" of the judgment. This is simply not true. Although Enron may have rights against the vessel owner, there does not appear to be any way to have the debt *secured* unless attachment of the vessel is allowed.

9. Chernomorneftegaz's brief admits that a sovereign's representative such as an employee may waive immunity.

10. Even if Mr. Asmus just represented Scan-Sov, Chernomorneftegaz through Mr. Gulev as Deputy Chairman of the Board of Chernomorneftegaz had the responsibility in good faith to correct any misstatement by Mr. Asmus.

11. It is hard to believe that Chernomorneftegaz would not have knowledge of the effect of its statements. As pointed out earlier, the TITAN 2 had been involved in a similar controversy. In *S.H.R.M. Catering vs. TITAN 2,* (unpublished S.D.Tex.1996), the TITAN 2 was attached and arrested. Both the maintenance agreement and the repair agreement were entered into in 1998, two years after the prior decision had been rendered. At the very least Chernomorneftegaz knew of the its ability to expressly waive immunity under § 1610(d).

**612**

*Gustav Sule,* 942 F.Supp. 1082, 1087 (E.D.La.1996) *citing Rodriguez v. Transnave Inc.,* 8 F.3d 284, 287 (5th Cir.1993) *citing* H.REP. NO. 1487, 94th CONG.2d SESS. 18 *reprinted in,* 1976 U.S.C.C.A.N. 6604, 6617. Nor is a foreign state immune in which an action is based upon a commercial activity carried on in the United States. *See* 28 U.S.C. § 1605(a)(2).

In the case at bar, the United States has jurisdiction over Chernomorneftegaz under both § 1605(a)(1) and (2). Immunity under (a)(1) was waived by agreeing to arbitration in the state of Texas and to be bound by the laws of Texas. Likewise, under (a)(2) Chernomorneftegaz admitted in oral arguments that the contracts were the result of commercial activity. The United States has personal jurisdiction over Chernomorneftegaz. Therefore, § 1610(d) is not being used to obtain jurisdiction because Enron has personal jurisdiction without the lien. Thus, Enron is using the attachment to secure the debt, not to obtain jurisdiction.

For all of the foregoing reasons, the motion to dissolve the arrest and dismiss the complaint by defendant Chernomorneftegaz shall be DENIED.

### *JUDGMENT*

Pursuant to the reasons articulated in the corresponding Memorandum Ruling; pursuant to the consent of both defendant Chernomorneftegaz and plaintiff to refer the pending matters to arbitration; and pursuant to the unopposed motion of defendant ScanSov to stay and refer the matter to arbitration [doc. 23], it is hereby

ORDERED that defendant Chernomorneftegaz's motion to dismiss the complaint, to dissolve the arrest and attachment of the TITAN 2, and for damages for unlawful seizure is hereby DENIED.

FURTHERMORE IT IS ORDERED that all matters between the parties are referred to arbitration, and the court stays all other actions unless further action after arbitration becomes warranted.